# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MOBILE HEALTHCARE
FACILITIES, LLC,

            Plaintiff,

vs.

AVANTE HEALTH SOLUTIONS,

          Defendant.

Civil Action File
No.:  1:21-cv-4038-SEG

---

## DEFENDANT AVANTE HEALTH SOLUTIONS'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Sarah E. Trevino
Georgia Bar No. 660094
Sarah Hannah Phillips
Georgia Bar No. 302869

**DENTONS US LLP**
303 Peachtree St., NE, Suite 5300
Atlanta, Ga 30308
Telephone: 404-527-4000
E-mail: sarah.trevino@dentons.com
sarahhannah.phillips@dentons.com

Jason R. Scheiderer
(admitted *pro hac vice*)

**DENTONS US LLP**
4250 Main St., Suite 1100
Kansas City, Missouri 64111
Telephone: 816-460-2400
E-mail: jason.scheiderer@dentons.com

## I.    <u>INTRODUCTION</u>

During the height of COVID-19, MHF began discussions with Colonel Coldwell of TDEM to supply Texas with mobile facilities.  (Affeldt Dep., 18:17-19:8.)  MHF contacted Avante in regard to ordering equipment.  (*Id*., Ex. 64.)  On September 8, 2020, MHF requested a quote for "36 ea. Ventilators."  (Hampton Dep., Ex. 4.)  After informing MHF of the items available during the pandemic, MHF agreed to purchase certain ventilators and hospital beds.  Only after MHF learned that it ordered its customer did not prefer the items MHF had selected, MHF attempted to place the blame on Avante.  The evidence, however, confirms that MHF received exactly what it chose and contracted for.  Indeed, MHF, to date, still has the items it selected in its possession.  Moreover, MHF has used those same items to promote its company on its website.

Yet, MHF now asserts a claim for breach of contract, fraud, and negligent misrepresentation, claiming that Avante should have decided what products MHF needed and should order for its mobile health facilities.  As further detailed in Avante's Motion for Summary Judgment (Dkt. No. 45) the record proves that ***all*** of MHF's claims fail.

## II.     FACTUAL BACKGROUND[1]

### A.     The Parties

Plaintiff Mobile Health Facilities ("MHF") is a company that provides "mobile healthcare solutions."  (ECF 101, ¶ 1.)  MHF's core business is providing trailers for mobile healthcare facilities.  (Dep. of Affeldt ("Affeldt Dep."), Dkt. No. 43, 23:3-7.)   Over the past couple of years, MHF has provided facilities to a customer in Phoenix, Arizona; for the Tohono O'odhma Tribe; and for the Arapah-Sioux Tribe in Montana.  (*Id.*, 21:42-22:6, 22:17-22, 26:19-27:11.)  It provides the "option" of a turnkey facility that contains medical equipment to 15-20% of its customers.  (*Id.* 28:6-15).   However, the subject facility—provided to TDEM—was the very first critical care unit MHF has ever tried to provide.  (*Id.,* 83:13-84:1.)

Kyle Affeldt is the CEO of MHF and Marlin Anderson is the CIO.  (*Id.*, 54:11-55:17).  Mr. Affeldt is the sole person at MHF who designs the facilities.  (*Id.*, 41:15-42:17.)   He selects and purchases equipment based on his previous

---

[1] Avante notes that this Court's standing order states: "All citations to the record evidence should be contained in each party's brief, not just in the party's statement of undisputed (or disputed) facts."  MHF did not abide by this rule and cites to its statement of material fact in its brief.  Avante will file contemporaneously its responses to those statements.  In addition, Avante restates its Statement of Material Fact in support of its Motion for Summary Judgement, Dkt. 45, herein.

position as Vice President for a company that built mobile surgery facilities.  (*Id.,* 42:8-17.)  He is "very knowledgeable in all of the different types of medical requirements for facilities" and considers himself as having "expertise" in "all of the different types of medical requirements for facilities."  (*Id.*)  Mr. Affeldt testified that, based on this expertise, he would never "hand that [decision] off to somebody that has very little experience in it."  (*Id.)*  He decides what equipment to buy through "internet searches" and through an independent medical consultant Nurse Feist.  (*Id.*, 34:16-20; 94:14-24.)

Avante is a medical equipment supplier, and provides the sale of ICU equipment, surgical equipment, and even veterinarian equipment.  (*Id.,* 54:11-55:17.)  Misty Hampton is sales representative at Avante.  (Dep. of Misty Hampton ("Hampton Dep."), Dkt. No. 44, 14:13-14.).  Ms. Hampton provides consulting services in that she "provides [customers] with specifications, any sort of technical . . . terms from the manual" and can provide features if asked.  (Hampton Dep., 178:9-18.)  She provides customers with as much information provided to Avante from the manufacturer.  (*Id.*).  She is not an "expert" in medical equipment.  (*Id.*, 186:18-20.)  While she considers herself to have some knowledge in medical equipment she is not "an expert in ventilators."  (*Id.*, 185:12-14.)

**B.      MHF's Contract with the State of Texas**

During the height of COVID-19, MHF began discussions with Colonel Coldwell of TDEM to supply Texas with mobile facilities.  (Affeldt Dep., Dkt. No. 43, 18:17-19:8.)  During these discussions, MHF contends that TDEM told MHF "everything they wanted, medical equipment wise."  (*Id.*, 36:19-37:5.)  MHF admitted to TDEM that the equipment was dependent on "what was available at the time of purchase."  (*Id.*, 37:1-5.)

On approximately August 25, 2020, Mobile Healthcare Facilities secured a $11.35 million contract with the State of Texas ("TDEM Contract") to set up mobile healthcare facilities to combat the COVID-19 pandemic.  (*Id.*, Dkt. No. 43-6).  The equipment list for the TDEM Contract includes:

  (9) Styker II Refurbished Electrical Hospital Beds for $40,500.

  (9) TBD Ventillators [*sic*] for $144,000.

(Dkt. No. 43-8, p. 5.)

**C.      MHF Facilities Contacts Avante to Order Equipment.**

Mr. Affeldt began researching MHF's equipment needs.  (Affeldt Dep., Dkt. No. 43, 39:10-19.)  MHF contacted Avante around August 25, 2020 in regard to ordering ultrasound systems as well as other equipment.  (Dkt. No. 43-5.)  On September 8, 2020, MHF requested a quote for "36 ea. Ventilators."  (Dkt No., 44-

4.)   Days later, Avante sent MHF Quote for, among other things, 36 Puritan Bennett PB840 Ventilators and 36 Avante Premio Plus E250 Hospital Beds.[2]   (Dkt. No. 44-8.)

On September 13, 2020, Ms. Hampton e-mailed MHF to notify them of the following:

- Ms. Hampton: "Also, after speaking with our production director, we need to revise your quote to replace the PB840 vent with the Vivo 65 shown here:   https://www.breas.com/products/vivo/vivo-65-usa/" (Dkt. No. 43-7.)
- MHF responded: "Is the reason current inventory? How does this ventilator compare to the PB840?" (*Id.*)
- Ms. Hampton responded: "Finding 36 refurbished ventilators of the same model is very difficult due to the current pandemic. The Vivo 65 is new and also does not require an air compressor, like the PB840. You are saving money and providing a better quality product." (*Id.*)
- MHF: "Excellent!" (*Id.*)

Neither MHF nor Mr. Affeldt did anything to independently verify the suitability of the Vivo 65 ventilators for Texas' emergency use.   (Dkt. No. 43, 95:16-20.)   Mr. Affeldt did no research.   (*Id.*, 93:20-94.)   He did not speak to TDEM or Nurse Feist.   (*Id.*, 94:14-24.)   He never even asked Avante if the Vivo 65

---

[2] After Avante provided the initial quote, MHF provided Avante with a copy of the Purchase Order with Texas so Avante knew "this deal is real."   (Hampton Dep., Dkt. No. 44-9.)

could be used in an ICU setting.  (*Id.*, 95:5-13).  Instead, he promptly approved the Vivo 65 and made his order.

After approval from MHF, Avante prepared an amended quote which included:

| SKU | DESCRIPTION | | |
|---|---|---|---|
| 40VIVO65N | BREAS VIVO 65 RESPIRATORY VENTILATOR | | |
| | | | |
| QTY | UOM | PRICE EACH | AMOUNT |
| 36.0000 | EA | 10,000.0000 | 360,000.000 |

(Hampton Dep., Dkt. No. 44-21.)  MHF has testified that the entire agreement consists of the Quote/Purchase Order and Payment.  (Affeldt Dep., Dkt. No. 43 192:15-8) ("Q. Tell me, what are the documents that make up your agreement with Avante? A. Purchase order and payment. Q. And those are the documents that comprise the contract? A. From my perspective, yes.").  MHF has testified that it agreed to the terms of this new quote.  (*Id.*, 193:13-17 ("Q.  You agree, though, that the purchase order is for the Vivo 65, right? A.  That was based on what they said was a better product than what I originally had in the original purchase order.")

Ms. Hampton informed MHF that "the hospital beds he had ordered were no longer available. So I had provided him with options that we had in stock that could meet his timeline."  (Hampton Dep., Dkt. No. 44, 100:5-9.)  In fact, Ms.

-6-

Hampton provided MHF with internet hyperlinks to two beds they had in stock: (1) the Avante Premio M3 bed, and the Premio RB bed.  (Dkt. No. 45-1, Exhibit C.) MHF later selected the $2,000.00 Premio RB Patient Bed via telephone conversation.  (Dkt. No. 45-1, attached as Exhibit D).

**D.     Months Later, TDEM Drastically Changes the Scope of the Project.**

On November 14, 2020, MHF e-mailed STRAC/TDEM an equipment list which contained the original purchase quote that had the beds listed as Stryker beds and the Ventilators as TBD.  (Affeldt Dep., Dkt. No. 43-8, p. 5.)  It also contained the following updated information:

| Electrical Hospital Beds | Avante Health Solution | PREMO E250 | https://avantens.com/p/avante-premio-e250-electric-hospital-bed/1516 | 36 | | x | Too Many and Too Bulky to ship and then reship. To be shipped directly to Texas during set up. |
|---|---|---|---|---|---|---|---|
| Ventillators | Avante Health Solution | BREAS VIVO 65 RESPIRATORY VENTILATOR | https://www.breas.com/products/vivo/vivo-65-usa/ | 36 | x | | Ship to BrewCo a week prior to Shipping to Texas |

(*Id.*, p. 8.)

STRAC, mentioning nothing about the venitaltors or beds, listed items it wanted to swap out.  (Dkt. No. 43-10.)  MHF's response was:

> Sara, . . . We understand the challenges TDEM has been under with all of the natural disasters (Hurricanes) and COVID-19 this fall and their manpower required to handle all of these emergencies. **However, this has made it difficult for us to receive the planning and direction we needed early on in this project. Not until this last week when your team came on-board, has there been the required focus on this project and communications with us so we can ensure the products meets your expectations.** However, we are up to the task of making the necessary adjustments to make it all work as quickly as possible without reducing the level of product quality.

(Dkt. No. 43-9) (emphasis added).

MHF admitted that TDEM had "**drastically change[d] the mission and scope of this project**," and

> **the sourcing of these pieces of equipment was never specific by TDEM.**  All of these items were sourced and put onto a quote by Mobile Healthcare Facilities primarily as just a conveneince service to TDEM.  [MHF] don't typically source this kind of equipment because it is also another way to quickly lose money.  In adidtion to no specifications for the equipment, this project had another problem form the receipt of the Purchase Order.

(Dkt. No. 43-10.) MHF admitted that this was when STRAC changed its mind and "wanted to use one of the manufacturers that it had experience with"—the Zoll ventilator.  (Dkt. No. 43, 129:20-22.)  Like the PB840, but unlike the Vivo 65, MHF actually conducted some diligence concerning the Zoll ventilator that STRAC desired.  (*Id.*, 130:5-19.)  At no point did STRAC say it wanted to change to a Zoll ventilator because it was approved or rated for use in an ICU.  (*Id.*, 131:13-22.)  MHF began contacting Zoll to purchase their ventilators.  (Dkt. No. 43-12.)

The next day, on November 20, 2020, MHF e-mailed Avante and told Avante "My customer does not like the following pieces of equipment that we purchased from you since they already have and use a different manufacturer for

these types of units and only after all of this time tell me what." (Dkt. No. 43-11.;
Dkt. No. 43, 140:5-18.)  In an attempt to fix both MHF's and TDEM's lack of
specifications and communication with each other, MHF tried to place the blame
on Avante.

After having the publicly available hyperlink to the Vivo 65 website for two
months, MHF finally read the information contained with the link and notified
Avante:

> I just went on the Bres website and it states "The device is intended to
> be used in home, institution, hospitals and portable applications such
> as wheelchairs and gurneys. It may be used for both invasive and non-
> invasive ventilation. The Vivo 65 is not intended to be used as a
> transport or critical care ventilator. Therefore, it is TRUE!

(Dkt. No. 43-13.)

True to form, MHF shows its lack of credibility when ordering products or
making changes.  As example, on December 7, 2020, Joe Palfini of TDEM asked
MHF "How much would it be to add two invasive blood pressure modules and an
end tidal CO2 with cables for each of the nine monitors in each trailer?"  (Dkt. No.
45-1, Exhibit E.)  Rather than make that change order, MHF, very dishonestly,
then e-mailed Avante stating that MHF was "What also just came to my attention,
you also sold me the wrong patient monitors. What we were to also have are the
monitors that also have two invasive blood pressure modules and an end tidal Co2

module with cables"—knowing full well that TDEM had changed its mind and MHF ordered the wrong one.  (Dkt. No. 45-1, Exhibit F.)

**E.     MHF Still has in its Possession the Nine Beds and Thirty Six Ventilators And Has Done Nothing to Mitigate Any Claimed Damages.**

Although MHF states that it initially rejected the first twenty-seven beds it received, it accepted a second shipment of nine beds.  (Dkt. No. 43., 74:17-22; 75:9-15.)  Because MHF believes "showing potential customers past successful projects is a good way to earn business," it unpacked, and promoted those nine beds on its website.  (*Id.*, 206:19-207:9.)  In fact, as of today, those are still in MHF's possession and still being promoted on its website.  (Dkt. No. 43-20, p. 4.)  Although MHF testified that it never put those beds in its facilities, when confronted with their website photographs, MHF stated "I said we never used them."  (Dkt. No. 43., 211:14-24.)  MHF admitted it set the beds up as a display, and took photos to promote on its website.  (*Id.*, 212:2-19.)

MHF admits that although it is attempting to recover damages for the ventilators, it still has the ventilators in its possession.  (*Id.*, 151:18-152:10.)  MHF has done nothing to mitigate any alleged damages.  It never attempted to sell the ventilators.  (*Id.*, 151:18-21.)  Nor did it ever attempt to donate the ventilators during the height of COVID-19 when hundreds of thousands of people were dying

throughout the world due to, in part, a critical shortage of ventilators. (*Id.*, 152:8-10.)

### III.   ARGUMENT AND CITATION OF AUTHORITIES

MHF argues that although it received the items it contracted for—and still has those items in its possession—that somehow it is entitled to over $450,000 in damages.

### A.   Avante Supplied MHF the Exact Ventilators it Ordered.

The Purchase Order dated September 11, 2020, notes that MHF agreed to purchase the following:

```
SKU                DESCRIPTION
40VIVO65N          BREAS VIVO 65 RESPIRATORY VENTILATOR
QTY        UOM        PRICE EACH           AMOUNT
36.0000    EA         10,000.0000          360,000.000
```
(Hampton Dep., Ex. 21.)

However, now MHF asserts that Avante somehow breached the Contract—i.e., the Purchase Order—by delivering exactly 36 Breas Vivo 65 Respiratory Ventilators.  MHF admits it agreed to change the order of ventilators from the original PB840 to the Vivo 65, and that it received the Vivo 65.  (Affeldt Dep., Dkt. No. 43, 193:13-17) ("Q.  You agree, though, that the purchase order is for the Vivo 65, right? A.  That was based on what they said was a better product than what I originally had in the original purchase order.")

-11-

While MHF insists that it agreed to the change order because Avante informed MHF that the Vivo 65 was a better product.  In fact, Avante said it was a "better quality product" because it "is new and also does not require an air compressor."  (Dkt. No. 43-7.)  Although it contends otherwise, at no point did Ms. Hampton state "this is a better product *because it can used in an ICU unit*."

MHF nonetheless contracted to receive the Vivo 65.  ***And it received just that***.  There cannot be a breach of contract between two sophisticated parties—one who provides mobile healthcare facilities throughout the country and another who provides products ordered—where the party delivered *exactly* what was contracted. (ECF 1-1, ¶ 1.)

Now, MHF argues, and expects this Court to believe that it was somehow dupped into ordering the ventilators.  By its own admission, MHF "is a longtime provider of mobile ICU facilities."  (Dkt. 47, p. 1.)  And Mr. Affeldt, himself, touts that he is the expert in medical equipment.  He is "very knowledgeable in all of the different types of medical requirements for facilities" and considers himself as having the "expertise" in "all of the different types of medical requirements for facilities."  (Dkt. 43, 42:8-17.)  Mr. Affeldt testified that based on this vast expertise, he would never "hand that [decision] off to somebody that has very little

experience in it."  (Dkt. 43, 42:8-17.)  But now, after his mistake, he attempts to do just that.

## B.      Avante Supplied MHF the Exact Beds it Ordered.

The evidence of record shows that Avante contacted MHF and explained that "we have a shortage on the Premio E250 hospital bed. . . if you require delivery before then, the good news is we have two options in stock."  (Dkt. No. 45-1, p. 204.)  Ms. Hampton included a link to the specs for the remaining bed. (*Id.*).

Although MHF, conveniently, states that it has "no recollection of receiving this e-mail," the undisputed evidence shows that the e-mail was sent.   No recollection of receipt of an e-mail is not the same as non-existence of that communication.   Thus, at minimum, there exists a jury question as to a change order concerning the beds.

## C.      MHF Accepted the Beds and Use them in an Act Inconsistent of its Alleged Rejection of Same.

As noted in its Motion for Summary Judgment, MFH's using the beds on its website to promote its mobile healthcare units is an act which is inconsistent with any alleged rejection of such goods.  Under Georgia law, "[A] buyer who purports to revoke his acceptance of goods may be found to have re-accepted them if, after such revocation, he performs acts which are inconsistent with the seller's

ownership of the goods." *Griffith v. Stovall Tire & Marine, Inc.*, 174 Ga. App. 137, 5:02-CV-2004, (1985); *Gill v. Blue Bird Wanderlodge*, No. 2004 WL 5311476, at *4, 2004 U.S. Dist. LEXIS 27437, at *16 (M.D. Ga Feb. 24, 2004) (plaintiff found to have reaccepted motor home where he drove it 13,000 miles after sending a letter of revocation); *see also Ardus Medical, Inc. v. Emanuel Cnty. Hosp. Authority*, 558 F. Supp. 2d 1301 (S.D. Ga. May 7, 2008) (could not show revocation where hospital still had the pumps in its possession).

In *Gill*, the plaintiffs alleged—as here—that they rejected a motorhome. 2004 WL 5311476, *4-5.  However, the plaintiffs did not dispute their continued used of the motorhome after the alleged revocation and filing of the suit.  *Id.*  The plaintiffs argued that the condition of the vehicle was not substantially changed and that their continued use was a question for the jury.  The court found that revocation of acceptance was a matter of law in circumstances such as this.  It granted summary judgment in favor of the defendant noting that it had presented unrefuted evidence that the plaintiffs continued to possess and use the vehicle after the purported revocation and after filing the suit.  "Plaintiffs continued acting as the owners of the vehicle" which was inconsistent with the theory of revocation. *Id.*

-14-

Similar to *Gill,* although MHF made complaints to Avante of brand of the nine beds it received, its continued use of the nine beds is inconsistent with any theory of revocation.   MHF unsealed and unpacked the beds and set them up for promotional use on their website.   (Affeldt Dep., Dkt. No. 43, 206:19-207:9.) MHF stated that "showing potential customers past successful projects is a good way to earn business."   (*Id.*, 206:19-207:9.)   In fact, well after the suit was filed, the beds were still in MHF's possession and still being promoted on its website. (Dkt. No. 43-20, p. 4.)   Although MHF testified that it never put those beds in its facilities, when confronted with their website photos, MHF stated "I said we never *used* them"   (Dkt. No. 43, 211:14-24.)   MHF admitted they set the beds up as a display, and took photos to promote on their website.   (*Id.*, 212:2-19.)

## D.    The Evidence of Record Shows that MHF Made No Attempt to Mitigate Damages.

O.C.G.A. § 13-6-5 states "[w]here by a breach of contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence."   *See also Gen. Elec. Capital Corp. v. Nucor Drilling, Inc.*, 551 F. Supp. 2d 1375, 1381 (M.D. Ga. 2018).

Even if Avante had failed to supply what it agreed upon—which it did not— MHF sat on the ventilators for over a year in an environment where the entire

world was in a critical shortage of ventilators.  MHF still has in its possession all thirty-six Vivo 65 ventilators.  MHF has done nothing by way of attempting to re-sell the ventilators.  (Dkt. No. 43, 151:18-21.)  Nor did it ever attempt to donate the ventilators during the height of COVID-19.  (*Id*., 152:8-10.)

As to the beds, although MHF states that it initially rejected the first twenty-seven beds it received, it accepted a second shipment of nine beds.  (*Id.*, 74:17-22; 75:9-15.)  Because MHF believes "showing potential customers past successful projects is a good way to earn business," it unpacked, and promoted those nine beds on its website.  (*Id.*, 206:19-207:9.)  In fact, as of today, those are still in MHF's possession and still being promoted on its website.  (Dkt. No. 43-20, p. 4.)  Although MHF testified that it never put those beds in its facilities, when confronted with their website photographs, MHF stated "I said we never used them" (Dkt. No. 43, 211:14-24.)  MHF admitted it set the beds up as a display, and took photos to promote on its website.  (*Id.*, 212:2-19.)

## D.   MHF has Offered No Evidence of Damages in its Motion.

In addition to MHF's failure to establish any breach of contract, MHF has also failed to establish its claim for damages.  As set forth above, the movant has the burden of establishing that there are no genuine issues of material fact as to each issue for which he is seeking summary judgment.  Since MHF is also seeking

summary judgment for its claim of damages, MHF is also required to present evidence establishing that there is no genuine issue as to a material fact regarding damages.

For its contention that it is somehow owed $91,800 for beds still in its possession and $360,000 for ventilators still in its possession, MHF cites to "SOF, ¶ 19" to support its alleged damages.  However, MHF's Statement of Material Fact, paragraph 19 merely lists a Revised Quotation.  *See* Dkt. 47-1.  MHF has offered no evidence of payment in its motion for summary judgment. Thus, because MHF has neither supplied, nor cited to any evidence of actual payment of these items—other than a photograph of an unprocessed check—a jury question exists as to the damages claimed by MHF.[3]

---

[3] To the extent MHF submits new evidence in a reply brief, Avante asks this Court to refrain from relying on such or allow Avante a surreply.  "When faced with a reply brief that offers new evidence, we, like the Tenth Circuit, conclude that the district court has two permissible courses of action. It can either (1) permit the nonmoving party to file a surreply or (2) refrain from relying on any new material contained in the reply brief. . . But it may not preclude the nonmoving party from filing a surreply and then grant summary judgment based on new material presented only in the reply brief."  *Atlantic Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 Fed. Appx 896 (11th Cir. 2019).

## IV.   **CONCLUSION**

On the undisputed facts, Avante asks the Court to deny Plaintiff's Motion for Partial Summary Judgment and grant Avante's Motion for Summary Judgment against all of MHF's claims.   MHF ignores that it received exactly what it contracted for and offers nothing by way of any attempt to mitigate damages. Although MHF attempts to muddy the record with its baseless claims that it "rel[ied] on Avante's expertise," it offers nothing by way of any reasonable reliance on such expertise, or that Avante is, in fact, an expert on MHF's equipment needs.   Instead, MHF admits that it "is a longtime provider of mobile ICU facilities" and got exactly what it contracted for.

Respectfully submitted this 11th day of November, 2022.

/s/ *Sarah Trevino*
Sarah E. Trevino
Georgia Bar No. 660094
Sarah Hannah Phillips
Georgia Bar No. 302869
**DENTONS US LLP**
303 Peachtree St., NE, Suite 5300
Atlanta, Ga 30308
Telephone: 404-527-4000
sarah.tremino@dentons.com
sarahhannah.phillips@dentons.com
Jason R. Scheiderer
(admitted *pro hac vice*)
**DENTONS US LLP**
4250 Main St., Suite 1100

-18-

Kansas City, Missouri 64111
Telephone: 816-460-2400
jason.scheiderer@dentons.com

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of

Georgia, that the foregoing **DEFENDANT AVANTE HEALTH SOLUTIONS'**

**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**

**JUDGMENT** complies with the font and point selections approved by this court in

L.R. 5.1B.  This pleading was prepared using 14-point Times New Roman Font.

/s/ *Sarah Trevino*
Sarah E. Trevino
Georgia Bar No. 660094

-20-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **DEFENDANT AVANTE HEALTH SOLUTIONS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** was filed on November 11, 2022 via the Court's ECF electronic filing system and will notify all participating registered users as follows:

> Brian S. Goldberg
> Leo Kogan
> FREEMAN MATHIS & GARY, LLP
> 100 Galleria Parkway
> Suite 1600
> Atlanta, Georgia 30339
> E-mail: bgoldberg@fmglaw.com
> lkogan@fmglaw.com
>
> Alan C. Manheim
> 25 Alexander Street
> Suite 3
> Marietta, Georgia 30060
> E-mail: alan@acmlaw.net

> _/s/ Sarah Trevino_
> Sarah Trevino
> Georgia Bar No. 660094

US_ACTIVE\122612738\V-2