# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| MOBILE HEALTHCARE FACILITIES, LLC,<br><br>          Plaintiff,<br>vs.<br><br>AVANTE HEALTH SOLUTIONS,<br><br>          Defendant. | Civil Action File<br>No.:  1:21-cv-4038-SEG |

## DEFENDANT AVANTE HEALTH SOLUTIONS'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Sarah E. Trevino
Georgia Bar No. 660094
Sarah Hannah Phillips
Georgia Bar No. 302869

**DENTONS US LLP**
303 Peachtree St., NE, Suite 5300
Atlanta, Ga 30308
Telephone: 404-527-4000
E-mail: sarah.trevino@dentons.com
sarahhannah.phillips@dentons.com

Jason R. Scheiderer
(admitted *pro hac vice*)

**DENTONS US LLP**
4250 Main St., Suite 1100
Kansas City, Missouri 64111
Telephone: 816-460-2400
E-mail: jason.scheiderer@dentons.com

## AVANTE'S RESPONSES TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.

Plaintiff Mobile Healthcare Facilities, LLC ("MHF" or "Plaintiff") is a corporation existing and duly organized under the laws of Nevada, and that is registered to do business in the State of Georgia. MHF has its principal place of business located in Powder Springs, Georgia. (Doc. No. 1, ¶ 1.).

**RESPONSE: Denied as characterized. Avante admits that Plaintiff Mobile Healthcare Facilities is registered to do business in the State of Georgia and has its principal place of business located in Powder Springs, Georgia. Avante denies any allegations as to its corporate structure on the grounds that MHF, itself, has sued under the name Mobile Healthcare Facilities, LLC, and not a corporation.**

2.

Plaintiff is, and at all times relevant to this action was, engaged in the business of providing mobile healthcare products and services to its clients. (*Id.*).

**RESPONSE: Denied as characterized. Avante admits that Plaintiff contends it is engaged in the business of providing mobile healthcare products and services to its clients.**

3.

Avante Heath Solutions ("Avante" or "Defendant") is a corporation existing and duly organized under the laws of the State of Delaware and that is registered to do business in the State of Kentucky. Avante is not registered to do business in the State of Georgia. (*Id.*, ¶ 2; Doc. No. 4, ¶ 2).

**RESPONSE: Admitted.**

4.

Avante holds itself out as a premier supplier of both new and used critical care medical equipment, at least some of which is suitable for use in an ICU. (Doc. No. 1, ¶ 8; Doc. No. 4, ¶ 8).

**RESPONSE:  Denied as characterized.  Avante admits that it holds itself out as a supplier of both new and used medical equipment.  Avante denies that it has held "itself out" or stated that any of its equipment is ICU compliant.  In fact, Ms. Hampton testified that she merely "provides [customers] with specifications, any sort of technical . . . terms from the manual" and can provide features if asked.  (Dkt. 44, 178:9-18.)**

5.

In August 2020, MHF was awarded a purchase order ("TDEM Purchase Order") from the State of Texas Department of Emergency Management ("TDEM") to provide four "turn-key" mobile ICU healthcare facilities stocked with

medical equipment for use in combating the COVID-19 pandemic ("Four Mobile ICU Units"). (Doc. No. 1, ¶ 7; Doc. No. 4, ¶ 7; *see also* Doc. No. 44, Depo. Misty Hampton at 31:24-32:1-2 ("Q: ...[MHF] stated that they are being funded for this contract by FEMA under the COVID-19 emergency situation, right? A: Yes."); *see also* Doc. No. 43, Depo. Kyle Affeldt at 37:19-38:7 ("Q: And did you have an understanding from the beginning of your interactions with Texas that it wanted both the structures and medical equipment? A: Yes. They wanted a turnkey project because ... of the 75 percent involvement with FEMA, they didn't want multiple vendors."); *see* Doc. No. 43-8, Exhibit 65 to Depo. Kyle Affeldt).

**RESPONSE:  Avante admits that MHF was awarded a contract to supply four healthcare facilities for TDEM.  Avante denies that the facilities were intended for the sole use of combatting the COVID-19 pandemic.**

6.

In relevant part, the TDEM Purchase Order required MHF provide Four Mobile ICU Units stocked with, among other things, 36 ventilators and 36 electrical hospital beds. (*See* Doc. No. 44-10; *see also* Doc. 43-8, at 9; *see also* Doc. No. 43 at 36:22-37:5 ("[The State of Texas Department of Emergency Management]...told me [MHF] everything they wanted, medical equipment wise. They gave me...a list of [medical equipment] they wanted")

-4-

**RESPONSE: Denied as characterized.   Avante admits that on approximately August 25, 2020, Mobile Healthcare Facilities secured a $11.35 million contract with the State of Texas ("TDEM Contract") to set up mobile healthcare facilities to combat the COVID-19 pandemic (Dkt. No. 43-6) and the equipment list for the TDEM Contract included:   "(9) Styker II Refurbished Electrical Hospital Beds for $40,500" and "(9) TBD Ventillators [sic] for $144,000." (Dkt. No. 43-8, p. 5.)**

7.

MHF searched for reliable medical equipment supply companies with expertise in the type of medical equipment needed to stock the Four Mobile ICU Units and located Avante as a potential supplier of 36 ventilators and 36 hospital beds needed for the Four Mobile ICU Units. (Doc. No. 43 at 34:16-35:3).

**RESPONSE:  Denied as characterized.  Avante admits that Mr. Affeldt testified that he did an internet search for medical equipment suppliers. Avante denies that it ever held itself out as an "expert" in the equipment needs of MHF. (Dkt. No. 43, 34:16-20; 94:14-24.)**

8.

MHF reached out to Avante concerning purchasing medical equipment for the Four Mobile ICU Units and, after some discussions, MHF expressed interest in

purchasing 36 ventilators and 36 hospital beds needed for the Four Mobile ICU Units. (Doc. No. 44 at 21:7-12; 23:15-20) ("Q: [MHF] was interested in buying ventilators from Avante, correct? A: Yes...Q:...They were interested in buying hospital beds as well, right? A: Yes").

**RESPONSE:   Denied as characterized.   Avante admits that MHF reached out to Avante concerning purchasing medical equipment and that MHF ordered specific medical equipment, which it received.**

9.

MHF communicated its medical equipment needs to Avante via emails between MHF's CEO, Kyle Affeldt and Avante's sales representative Misty Hampton (*See* Doc. Nos. 44-3 through 44-22) as well as telephone calls with both Ms. Hampton and Avante CEO/President Joel Weihe. (Doc. No. 44 at 28:11; Doc. No. 43 at 57:3-59:10 ("Q: And who at Avante said that they fully understood the needs and requirements of MHF? A: Joel [Weihe], because I actually sent him a copy of my Texas contract, and he read the contract. He knew exactly what the project was for and what [] was needed...[and] Misty [Hampton]...I sent her the contract, then I sent it to Joel and actually had a conversation with Joel discussing this project in detail that –and what it was for, and he had an actual copy of my contract with the State of Texas")).

**RESPONSE: Denied as characterized. Avante admits that MHF supplied Avante with a contract MHF had with TDEM which stated: "(9) Styker II Refurbished Electrical Hospital Beds for $40,500" and "(9) TBD Ventillators [sic] for $144,000." (Dkt. No. 43-8, p. 5.) Avante denies Mr. Affeldts characterization that Mr. Weihe somehow "fully understood the needs and requirements of MHF" simply because MHF supplied Avante with a generic, nondescript contract between MHF and TDEM.**

### Avante is Repeatedly Made Aware that MHF Seeks to Purchase Equipment for Use in Four *Mobile ICUs*[1]

Avante was made well-aware that MHF was building Four Mobile ICU Units for the State of Texas Emergency Management on numerous occasions including, but not limited to the following.

**RESPONSE:  Avante denies all unnumbered statements made by MHF in its Statement of Material Fact.**

10.

---

[1] Avante denies all headings in MHF's Statement of Material Fact.  As such, Avante will not restate headings made by MHF as each is not a statement of fact and is a mere characterization of MHF's baseless arguments.

On September 8, 2020, Mr. Affeldt sent Ms. Hampton an email wherein he expressly stated that "[MHF's] current contract is for 4 Mobile ICU Facilities. The contract is with the Texas Division of Emergency Management. They are being funded for this contract by FEMA under the COVID-19 emergency situation" (Doc. No. 44-3; *see also* Doc. No. 44 at 30:11 – 31:13).

**RESPONSE:  Denied as characterized.  Avante admits that this e-mail was sent to Ms. Hampton, however, denies that this e-mail somehow supports MHF's unnumbered statement preceding No. 10.**

11.

Mr. Affeldt and Ms. Hampton exchanged no fewer than twelve (12) emails under a subject heading "20-0003-585_Mobile Healthcare Facilities - Mobile ICU w/ Truck Tractor. (*See* Doc. Nos. 9, 12, 13, 14, 15, 17, 18, 19, 20, 22, 25 and 26.) (emphasis added).

**RESPONSE:    Denied  as  characterized.    Avante  admits  that communications were had between MHF and Ms. Hampton, however, denies that these communications somehow support MHF's unnumbered statement preceding No. 10.**

12.

Ms. Hampton has also explicitly admitted that Mr. Affeldt informed her that

Plaintiff sought to purchase ventilators and other equipment for use in an ICU

setting:

Q. ... So according to this email, Kyle Affeldt informed you that their current contract is for four mobile ICU facilities, right?
A. Yes.
Q. Okay. And that would be for -- that would be four mobile intensive care unit facilities, right?

...

THE DEPONENT: I would -- I would believe that to be correct.

BY MR. GOLDBERG:
Q. Okay. And he informed you that the contract was with the Texas Division of Emergency Management, right?
A. Yes.

(Doc. No. 44 at 31:10-22; Doc. No. 44-3; see also, Doc. No. 44 at 24:3-6

("Q: You were aware that Mobile Healthcare Mobile Healthcare Facilities was

building these mobile facilities for the State of Texas Emergency Management,

correct? A: Yes. I was made aware of that.")).

**RESPONSE: Denied as characterized.  The evidence cited shows that**

**the current contract between TDEM and MHF was for four mobile intensive**

**care unit facilities.  The evidence cited does not mention any reference to the**

**equipment discussed, nor does it show that Avante made any promises about the equipment.**

<div align="center">13.</div>

Mr. Affeldt also provided Ms. Hampton with a copy of the TDEM Purchase Order, which states, on its face, that the "PURCHASE IS IN RESPONSE FOR AN EMERGENCY REQUIREMENT AND IS AUTHORIZED UNDER THE PROVISION OF TEXAS GOVERNMENT CODE, SECTION 418.014 DISATER DECLARATION ISSUED BY GOVERNOR ABBOTT" for four "Mobile ICU w/ Truck Tractor" by the "Texas Division of Emergency Management (TDEM)" under "INCIDENT 20-0003 nCoV 2020". (Doc. Nos. 44-9 and 44-10.) (emphasis added).

**RESPONSE:   Denied as characterized.   Avante admits that communications were had between MHF and Ms. Hampton, however, denies that these communications somehow support MHF's unnumbered statement preceding  No. 10.**

<div align="center">14.</div>

On September 11, 2020, Avante provided MHF with Quote No. Q015718 (the "Initial Quote") to purchase certain medical equipment, including, but not limited to, thirty-six (36) "Puritan Bennett PB840 Ventilators" ("PB840

Ventilators") and 36 "Avante Premio Plus E250 Electric Hospital Bed[s]" ("Premio Plus E250 Beds") (Doc. No. 1, ¶ 12; Doc. No 4, ¶ 12); see also Doc. No. 44-8).

**RESPONSE:  Admitted. Avante further admits that MHF agreed to this quote.**

15.

The Initial Quote provided a price of the thirty-six (36) PB840 Ventilators at $10,350.00 each, for a total price of $372,600.00. (*Id.*; see also Doc. No. 44 at 37:23-11 (admitted to ventilators price)).

**RESPONSE: Admitted**

16.

The Initial Quote also provided a price of the 36 Premio Plus E250 Beds at $2,550.00 each, for a total price of $91,800.00. (Doc. No. 44 at 39:11-40:2).

**RESPONSE: Admitted.**

17.

On September 13, 2020, Misty Hampton (sent an email to MHF that the PB840 Ventilators listed in Initial Quote had to be replaced with the Vivo 65 Ventilator. She states in the email as follows:

> **After speaking with our production director, we need to revise your quote to replace the PB840 vent with the Vivo 65 shown here: https://www.breas.com/products/vivo/vivo-65-usa/ I hope to have answers to your questions regarding payment terms and shipping estimate soon.**

(Doc. No. 1, ¶ 16; Doc. No. 4, ¶ 16; Doc. No. 44-13).

**RESPONSE: Admitted.  However, denies that this is the entirety of the communication.**

18.

Avante sales representative Misty Hampton provided a second quote ("Revised Quote") to MHF for the purpose of substituted the 36 PB840 Ventilators with 36 "Breas Vivo 65 Respiratory Ventilator[s]" ("Vivo 65 Ventilators"). (Doc. No. 44 at 76:16-25; Doc. No. 44-21).

**RESPONSE:  Admitted. Avante further admits that MHF agreed to this quote.**

19.

Like the Initial Quote, the Revised Quote listed the purchase of thirty-six (36) Premio Plus E250 hospital beds at a price $2,550.00 each for a total of $91,800. (Doc. 44-8; Depo. Avante 30(b)(6) [Misty Hampton] [Doc. 46] at 59:24 – 60:2). However, for ventilators, the Revised Quote included an updated price of

$360,000.00 for thirty-six (36) Vivo 65 Ventilators at $10,000.00 each. (Doc. No. 44 at 78:7-11; Doc. No. 44-21).

**RESPONSE: Admitted.**

20.

In response, MHF asked Avante the reason for the Revised Quote and replacing the PB840 Ventilators with the Vivo 65. Specifically, Mr. Affeldt asked Avante, "[h]ow does this [Vivo 65] ventilator compare to the PB840". (Doc. No. 44 at 59:13-15; Doc. No. 44-15 at 2).

**RESPONSE:  Admitted. Avante further admits that Mr. Affeldt never asked anything about whether the Vivo 65 ventilators were compliant with ICU standards and requirements.  Mr. Affeldt admitted that he did nothing to research the needs to fulfill his contract with TDEM.  (Dkt. 43, 93:20-94.)**

21.

Avante sales representative Misty Hampton responded that "[f]inding 36 refurbished ventilators of the same model is very difficult due to the current pandemic. The Vivo 65 is new and also does not require an air compressor, like the PB840. You are saving money and providing a better-quality product." (Doc. No. 44 at 65:6-13; Doc. No. 44-22 at 3) (emphasis added).

-13-

**RESPONSE: Admitted.  Avante further admits that at no point did Ms. Hampton state that the Vivo 65 should, or could be used in an ICU setting— nor did Mr. Affeldt ask.**

22.

Despite having direct knowledge and information that MHF intended to use the medical equipment purchased in the Four Mobile ICU Units, Avante sales representative Misty Hampton advised MHF that the Vivo 65 Ventilator was a "better quality product" than the PB840 Ventilator, when in fact the Vivo 65 Ventilator was not suitable for ICU use. (Doc. No. 1, ¶ 18; Def's First Supp. Resp. to Pl's First Set of Inter., Requests for Prod. Of Doc., and Req. for Ad. at 37, ¶ 1 [Doc. 46-4] ("Defendant admits that as detailed on the Vivo 65 website located at www.breas.com/products/vivo/vivo-65-usa/, the 'Vivo 65 is not intended to be used as a transport or critical care ventilator.'")).

**RESPONSE: Denied as characterized.   Avante further states that "better quality product" is not the same as "suitable for ICU use." Moreover, the website does not say "not suitable for ICU use," but rather states "not intended to be used as a transport or critical care ventilator."**

23.

MFH relied upon the expertise of Avante, a global supplier of medical equipment, to provide it with the right medical equipment when they advised that the Vivo 65 was a "better quality product" than the PB840 Ventilator. (Doc. No. 43 at 169:6:10).

**RESPONSE:  Denied.  MHF admits that Mr. Affeldt is the expert in medical equipment and Avante admits that MHF has no reasonable basis to ignore MHF's own stated expertise.**

24.

On September 24, 2020, MHF executed a purchase order for, among other medical equipment, the purchase of the 36 Vivo 65 Ventilators and 36 Premio Plus E250 Beds (Doc. No. 44-23) and simultaneously remitted a check in the amount of $682,000.00, to Avante. (Doc. No. 44-24). That same day, Mr. Affeldt sent an email to Ms. Hampton attaching a copy of the signed purchase order and the Revised Quote along with a photograph of the check and stating "[a]s per my phone call with you yesterday, we are going to purchase all of the equipment listed on the attached quote." (Doc. No. 44-22).

**RESPONSE: Admitted.  Avante also admits that after being informed that the beds were not available, Ms. Hampton got verbal approval via telephone to substitute the beds for those available. (Dkt. No. 45-1, Exhibit D.)**

-15-

25.

On the same day that Mr. Affeldt signed the Purchase Order and sent to Ms. Hampton, Ms. Hampton emailed Mr. Affeldt a response. (Doc. No. 43-15). In her response email, Ms. Hampton first thanked Mr. Affeldt for his order and for sending the check. *Id*. She then discussed the payment process. *Id*. Next, she asked about MHF's lead time, noting that items that require manufacturing will take time. *Id*. Finally, Ms. Hampton noted there was a shortage of Premio E250 beds and suggested two alternative types of hospital beds that MHF could purchase if it wanted to obtain the beds before a certain date. *Id*.

**RESPONSE:  Admitted. Avante further admits that Ms. Hampton got verbal approval via telephone to substitute the beds for those available. (Dkt. No. 45-1, Exhibit D.)**

26.

After sending the aforementioned email, Ms. Hampton sent no additional emails discussing these "alternative" beds until well after the incorrect beds had already been delivered. (*See generally*, Doc Nos. 44-25 – 44-31, 44-43.). Mr. Affeldt never responded to the aforementioned email from Ms. Hampton, and he testified that he does not recall reading it. (*See* Doc. No. 43 at 182:11 – 183:1). In fact, several weeks later on October 12, 2020, Mr. Affeldt emailed Ms. Hampton

stating, among other things, "After reviewing the size and dimensions of Avante Premio Plus E250 Electric Hospital bed, the most efficient and effective way to get this product to our customer is to have it direct shipped to their address." (Doc. 44-26).

**RESPONSE:  Denied as characterized.  Avante admits that Ms. Hampton did not send an additional e-mail as she had already received verbal approval from MHF to send the beds that were available.  (Dkt. No. 45-1, Exhibit D.) Avante denies that Mr. Affeldt never responded the e-mail as the evidence of record shows that he responded verbally.**

27.

Subsequently, around December 7, 2020, Avante delivered 36 hospital beds to MHF, but the hospital beds that were supplied were not the Premio Plus E250 hospital beds. Instead, Avante had delivered completely different "SS RetractaBed[s]" to MHF. (Doc. No. 1 ¶ 24; Doc. No. 4 ¶ 24; Doc. No. 44 at 158:4-7 ("Q. To your knowledge, were there any Premio 250 . . . beds ever sent to [MHF]? A. I don't believe so."); ιδ. at 155:8 – 20; 156:15 (admitting "they are different beds"); ιδ. at 157:18-23 (admitting MHF informed Avante that MHF did not receive the Premio Plus E250 hospital beds); Doc. No. 43 at 175:23 – 176:19).

**RESPONSE:  Avante admits that the beds delivered were not Premio Plus E250 beds, but were the beds agreed to by MHF.**

28.

Specifically, on December 7, 2020, MHF wrote to Avante sales representative Misty Hampton as follows:

> Misty, [w]hat is Avante doing and trying to pull??? I purchased 36 Avante 250 Premio Plus Electrical Hospital Beds! What I received are pieces of crap Med Mizer Retract a Beds....[t]he type of bed and level of quality is not even close.
>
> Here is what I purchased:



> Here is what I got:



> Between the wrong vents and now this, my customer FEMA is not happy...[g]et me the right ones immediately...and give me the RMA for return of the vents and these first 9 beds and you have someone come and pick them up.

(Doc. 43-43 at 2).

**RESPONSE:  Denied as characterized.  Avante admits that after he received word from TDEM that they did not like the beds, Mr. Affeldt attempted to redirect the blame onto Avante.**

29.

In response, on December 7, 2020, Avante sales representative Misty Hampton writes in an email as follows:

> Because the hospital beds are a product that we stock and after consulting with management, we have decided to accept their return. We typically offer a full credit or a refund with 40% restocking fee. Management is allowing me to reduce this restocking fee to 20% if you would prefer a refund. We will also deduct the return shipment cost from the return of the beds. There will be two return shipments of the beds: the refusal for delivery of 27 beds today, and the pickup of the 9 beds which were already delivered.

(*Id.* at 1).

**RESPONSE:  Admitted.**

30.

On December 8, 2020, MHF wrote back to Avante sales representative Misty Hampton as follows:

> That is total unacceptable. We did not order the bed you shipped us. We are not going to pay a 20% restock fee for your company trying to commit fraud. I need to know when I will be receiving the beds that I ordered. I also

need to know when I will be receiving the RMA for the
wrong ventilators?

(*Id.*).

**RESPONSE:   Denied as characterized.   Avante admits that after
receiving what it ordered, MHF refused to abide by the return policy of
Avante.   Avante also admits that after MHF received word from TDEM that
MHF had ordered the wrong items, that he boldly threatened Avante with
baseless allegations of "fraud."**

31.

The aforementioned events occurred despite the fact that, as part of Avante's
3(b)(6) deposition, Ms. Hampton testified that this Purchase Order and Revised
Quote constitute the agreement between Plaintiff and Defendant and admitted that
the purchase order was never updated to reflect a change from the Premio E250 beds.
(*See, e.g.,* Doc. No. 46 at 34:2-5 ("The agreement that I'm aware of is the purchase
order that they sent to purchase equipment based on the quote that we provided"; *see
also, id.* at 60:79 ("Q. And the purchase order was neve updated to reflect any
changes in that order, right? A. To my knowledge, that's correct."). At other points
during Avante's 30(b)(6) deposition, Ms. Hampton testified that emails could also
constitute a part of the agreement. (*See generally, id.* at 28 – 36.)

-20-

**RESPONSE:  Denied as characterized.  Although the parties agree what documents constitute the contract, in its Motion, MHF points to extrinsic evidence such as certain e-mails. (Dkt. 47, p. 4-5.) While MHF stated that it had no recollection of any conversation changing the beds, there is at best, a jury question as to whether this conversation occurred.  No recollection is not an affirmative statement that the conversation did not occur.**

32.

After receiving and inspecting the ventilators, on November 30, 2020, TDEM communicated to MHF that the Vivo 65 Ventilators would not be usable in the Four Mobile ICU Units because they are "clearly marked unable to be used in a critical care setting. Unfortunately, we will not be able to use or pay for those. Those are items which would never have been able to be used in a mobile ICU. Those costs will need to be removed." (Doc. No. 43-13 at 2).

**RESPONSE:  Denied.  Only after TDEM informed MHF that it wanted to use the Zoll ventilators did MHF attempt to shift blame to Avante.  MHF admitted that this was when STRAC changed its mind and "wanted to use one of the manufacturers that it had experience with"—the Zoll ventilator.  (Dkt. No. 43, 129:20-22.)  MHF admitted that it did not want the Vivo ventilators because its "customer does not like the following pieces of equipment that we**

**purchased from you since they already have and use a different manufacturer for these types of units and only after all of this time tell me what." (Dkt. No. 43-11; Dkt. No. 43, 140:5-18.)**

33.

After receiving the November 30, 2020 email from TDEM, MHF immediately

contacted Avante sales representative Misty Hampton, writing the following:

> I am having a huge problem with the ventilators that you
> sold me. You sold me the following ventilator
> 40VIVO65N BREAS VIVO 65 RESPIRATORY
> VENTILATOR 36.0000. EA 10,0000.0000 360,000.000
> My customer [TDEM] is refusing to pay for them since
> they said "[i]t was brought to our attention that the
> ventilators you purchased are clearly marked unable to be
> used in a critical care setting. Unfortunately, we will not
> be able to use or pay for those. Those are items which
> would never have been able to be used in a mobile ICU."
> Is this true? If so, you should have never sold us those
> since you knew how those were going to be used. If false,
> please provide me with immediate documentation to the
> contrary. If true, I expect total refund for these items.

(Doc. No. 43 at 164:23 – 167:8; Doc. No. 73).

**RESPONSE: Denied as characterized. Avante admits that after TDEM informed MHF that it wanted to use the Zoll ventilators did MHF attempt to shift blame to Avante. MHF admitted that this was when STRAC changed its mind and "wanted to use one of the manufacturers that it had experience**

**with"—the Zoll ventilator.  (Dkt. 43, 129:20-22.)  MHF admitted that it did**

**not want the Vivo ventilators because its "customer does not like the following**

**pieces of equipment that we purchased from you since they already have and**

**use a different manufacturer for these types of units and only after all of this**

**time tell me what."  (Dkt No. 43-11; Dkt. No. 43, 140:5-18.)**

<div align="center">34.</div>

MHF sent an additional email to Avante sales representative Misty Hampton

on the same date as follows:

> Misty, I just went on the Bres website and it states [t]he
> Vivo 65 is not intended to be used as a transport or critical
> care ventilator.. .[a]s I stated in my first email this was for
> a Mobile ICU.. .since your company is a major medical
> equipment supplier, you know that an ICU is "critical
> care" and the ventilators that you were to supply required
> critical care. All of the other equipment that you provided
> us meets that criterion except for these ventilators.
> Therefore, you need to get with your supplier and force
> them to accept the return of these items. They have not
> been used in any aspect and are in their original packaging.

(*Id.* at 1.).

**RESPONSE:  Denied as characterized.  Avante admits that MHF did**

**not do any due diligence before selecting the Vivo 65 ventilators, and only**

**after it received the ventilators it agreed to, did it research the website.**

## AVANTE'S STATEMENT OF MATERIAL FACTS

**A.     The Parties**

1.      Plaintiff Mobile Health Facilities ("MHF") is a company that provides "mobile healthcare solutions."  (ECF 101, ¶ 1.) MHF's core business is providing trailers for mobile healthcare facilities. (Dep. of Affeldt ("Affeldt Dep."), Dkt. No. 43, 23:3-7.)

2.      Over the past couple of years, MHF has provided facilities to a customer in Phoenix, Arizona; for the Tohono O'odhma Tribe; and for the Arapah-Sioux Tribe in Montana.  (*Id.*, 21:42-22:6, 22:17-22, 26:19-27:11.)

3.      It provides the "option" of a turnkey facility that contains medical equipment to 15-20% of its customers.  (*Id.* 28:6-15).  However, the subject facility—provided to TDEM—was the first critical care turnkey unit MHF has ever provided.  (*Id.,* 83:13-84:1.)

4.      Kyle Affeldt is the CEO of MHF and Marlin Anderson is the CIO.  (*Id.*, 54:11-55:17).

5.      Mr. Affeldt is the sole person at MHF who designs the facilities. (*Id.*, 41:15-42:17.)  He selects and purchases equipment based on his previous position as VP for a company that built mobile surgery facilities. (*Id,*. 42:8-17.)

6.      Mr. Affeldt has stated he is "very knowledgeable in all of the different types of medical requirements for facilities" and considers himself as having "expertise" in "all of the different types of medical requirements for facilities." (*Id.*)

7.      Mr. Affeldt testified that based on this expertise, he would never "hand that [decision] off to somebody that has very little experience in it." (*Id.*)

8.      Mr. Affeldt decides what equipment to buy through "internet searches" and through the advice of an independent medical consultant, Nurse Feist.  (*Id.*, 34:16-20; 94:14-24.)

9.      Avante is a medical equipment supplier, and provides the sale of ICU equipment, surgical equipment, and even veterinarian equipment.  (*Id.,* 54:11-55:17.)

10.      Misty Hampton is sales representative at Avante. (Dep. of Misty Hampton ("Hampton Dep."), Dkt. No. 44, 14:13-14.).

11.      Ms. Hampton provides consulting services in that she "provides [customers] with specifications, any sort of technical . . . terms from the manual" and can provide features if asked.  (*Id.*, 178:9-18.)

12.      Ms. Hampton provides customers with as much information provided to Avante from the manufacturer.  (*Id.*).

13.   Ms. Hampton does not hold herself out as an expert. (*Id.*, 186:18-20.) While she considers herself to have some knowledge in medical equipment she is not "an expert in ventilators." (*Id.*, 185:12-14.)

**B.   MHF's Contract with the State of Texas**

14.   During the height of COVID-19, MHF began discussions with Colonel Coldwell of TDEM to supply Texas with mobile facilties.  (Affeldt Dep., Dkt. No. 43, 18:17-19:8.)

15.   During these discussions, MHF contends that TDEM told MHF "everything they wanted, medical equipment wise."  (*Id.*, 36:19-37:5.)   MHF admitted to TDEM that the equipment was dependent on "what was available at the time of purchase."  (*Id.*, 37:1-5.)

16.   On approximately August 25, 2020, Mobile Healthcare Facilities secured a $11.35 million contract with the State of Texas ("TDEM Contract") to set up mobile healthcare facilities to combat the COVID-19 pandemic.  (Id., Dkt. No. 43-6).

17.   The equipment list for the TDEM Contract included:  "(9) Styker II Refurbished Electrical Hospital Beds for $40,500" and "(9) TBD Ventillators [*sic*] for $144,000." (Dkt. No. 43-8, p. 5.)

**C.      MHF Facilities Contacts Avante to Order Equipment.**

18.      Mr. Affeldt began researching MHF's equipment needs in late August 2020. (Affeldt Dep., Dkt. No. 43, 39:10-19.)

19.      MHF contacted Avante around August 25, 2020 in regard to ordering ultrasound systems as well as other equipment.  (Dkt. No. 43-5.)

20.      On September 8, 2020, MHF requested a quote for "36 ea. Ventilators."  (Dkt No., 44-4.)

21.      Days later, Avante sent MHF Quote for, among other things, 36 Puritan Bennett PB840 Ventilators and 36 Avante Premio Plus E250 Hospital Beds.  (Dkt. No. 44-8.)

22.      After Avante provided the initial quote, MHF provided Avante with a copy of the Purchase Order with Texas so Avante knew "this deal is real."  (Dkt. No. 44-9.)

23.      MHF discussed the PB840 ventilators with an "outside consultant" and requested she verify if they were ICU compliant.  (Affeldt Dep., Dkt. No. 43, 43:16-44:5; 44:12-18.)

24.      On September 13, 2020, Ms. Hampton e-mailed MHF to notify them of the following:  "Also, after speaking with our production director, we need to

revise your quote to replace the PB840 vent with the Vivo 65 shown here: https://www.breas.com/products/vivo/vivo-65-usa/" (Dkt. No. 43-7.)

25.    MHF responded: "Is the reason current inventory? How does this ventilator compare to the PB840?" (*Id.*)

26.    Ms. Hampton responded: "Finding 36 refurbished ventilators of the same model is very difficult due to the current pandemic. The Vivo 65 is new and also does not require an air compressor, like the PB840. You are saving money and providing a better quality product." (*Id.*)

27.    MHF responded: "Excellent!" (*Id.*)

28.    Neither MHF nor Mr. Affeldt did anything to independently verify the suitability of the Vivo 65 ventilators. (Dkt. No. 43, 95:16-20.)

29.    Mr. Affeldt did no research to independently verify the suitability of the Vivo 65 ventilators. (*Id.*, 93:20-94.)

30.    Mr. Affeldt did not speak to TDEM or Nurse Feist to independently verify the suitability of the Vivo 65 ventilators. (*Id.*, 94:14-24.)

31.    Mr. Affeldt never even asked Avante if the Vivo 65 could be used in an ICU setting. (*Id.*, 95:5-13)

32.    After approval from MHF, Avante prepared an amended quote which included:

| SKU | DESCRIPTION | | |
|---|---|---|---|
| 40VIVO65N | BREAS VIVO 65 RESPIRATORY VENTILATOR | | |

| QTY | UOM | PRICE EACH | AMOUNT |
|---|---|---|---|
| 36.0000 | EA | 10,000.0000 | 360,000.000 |

(Dkt. No. 44-21.)

33.    MHF has testified that the entire agreement consists of the Quote/Purchase Order and Payment.  (Affeldt Dep., Dkt. No. 43, 192:15-8) ("Q. Tell me, what are the documents that make up your agreement with Avante? A. Purchase order and payment. Q. And those are the documents that comprise the contract? A. From my perspective, yes.").

34.    MHF has testified that it agreed to the terms of this new quote. (*Id.*, 193:13-17 ("Q.  You agree, though, that the purchase order is for the Vivo 65, right? A.  That was based on what they said was a better product than what I originally had in the original purchase order.")

35.    Ms. Hampton informed MHF that "the hospital beds [it] had ordered were no longer available. So [she] had provided [it] with options that [Avante] had in stock that could meet [MHF's] timeline."  (Dkt. No. 44, 100:5-9.)

36.    In fact, Ms. Hampton provided MHF with internet hyperlinks to two beds Avante had in stock: (1) the Avante Premio M3 bed, and the Premio RB bed. (Dkt. No. 45-1, attached as Exhibit C.)  MHF later selected the $2,000.00 Premio

RB Patient Bed via telephone conversation.  (Dkt. No. 45-1, attached as Exhibit D).

**D.      Months Later, TDEM Drastically Changes the Scope of the Project.**

37.     On November 14, 2020, MHF e-mailed to STRAC/TDEM the equipment list which contained the original purchase quote that had the beds listed ats Stryker beds and the Ventilators as TBD.  (Dkt. No. 43-8, p. 5.) It also contained the following updated information:

| Electrical Hospital Beds | vante Health Solution | PREMO E250 | https://avantens.com/p/avante-premio-e250-electric-hospital-bed/1516 | 36 | | X | | Too Many and Too Bulky to ship and then reship. To be shipped directly to Texas during set up. |
| Ventilators | vante Health Solution | BREAS VIVO 65 RESPIRATORY VENTILATOR | https://www.breas.com/products/vivo/vivo-65-usa/ | 36 | X | | | Ship to BrewCo a week prior to Shipping to Texas |

(*Id.*, p. 8.)

38.     STRAC, mentioning nothing about the venitaltors or beds, listed items they wanted to swap out.  (Dkt. No. 43-10.) MHF's response was:

> Sara, . . . We understand the challenges TDEM has been under with all of the natural disasters (Hurricanes) and COVID-19 this fall and their manpower required to handle all of these emergencies. **However, this has made it difficult for us to receive the planning and direction we needed early on in this project. Not until this last week when your team came on-board, has there been the required focus on this project and communications with us so we can ensure the products meets your expectations.** However, we are up to the task of making the necessary adjustments to make it all work as quickly as possible without reducing the level of product quality.

(Dkt. No. 43-9) (emphasis added).

-30-

39.   MHF admitted that TDEM had "**drastically change[d] the mission and scope of this project**," and

> **the sourcing of these pieces of equipment was never specific by TDEM.**   All of these items were sourced and put onto a quote by Mobile Healthcare Facilities primarily as just a conveneince service to TDEM.   [MHF] don't typically source this kind of equipment because it is also another way to quickly lose money.   In adidtion to no specifications for the equipment, this project had another problem form the receipt of the Purchase Order.

(Dkt. No. 43-10.)

40.   MHF admitted that this was when STRAC changed its mind and "wanted to use one of the manufacturers that it had experience with"—the Zoll ventilator.  (Dkt. No. 43, 129:20-22.)

41.    Like the PB840, but unlike the Vivo 65, MHF actually conducted some diligence concerning the Zoll ventilator that STRAC desired. (*Id.*, 130:5-19.)

42.   At no point did STRAC say it wanted to change to a Zoll ventilator because it was approved or rated for use in an ICU. (*Id.*, 131:13-22.)  MHF began contacting Zoll to purchase their ventilators. (Dkt. No. 43-12.)

43.   The next day, on November 20, 2020, MHF e-mailed Avante and told Avante "My customer does not like the following pieces of equipment that we purchased from you since they already have and use a different manufacturer for

these types of units and only after all of this time tell me what."  (Dkt. No. 43-11.;

Dkt. No. 43, 140:5-18.)

44.    In an attempt to fix both MHF's and TDEM's lack of specifications

and communication with each other, MHF tried to place the blame on Avante.

45.    After having the publicly available hyperlink to the Vivo 65 website

for two months, MHF finally read the link and notified Avante:

> I just went on the Bres website and it states "The device is intended to
> be used in home, institution, hospitals and portable applications such
> as wheelchairs and gurneys. It may be used for both invasive and non-
> invasive ventilation. The Vivo 65 is not intended to be used as a
> transport or critical care ventilator. Therefore, it is TRUE!

(Dkt. No. 43-13.)

46.    True to form, MHF shows zero honesty when ordering products or

making changes.

47.    As example, on December 7, 2020, Joe Palfini of TDEM asked MHF

"How much would it be to add two invasive blood pressure modules and an end

tidal $CO_2$ with cables for each of the nine monitors in each trailer?" ?" (Dkt. No.

45-1, Exhibit E.)

48.    Rather than make that change order, MHF, very dishonestly, then e-

mailed Avante stating that MHF was "What also just came to my attention, you

also sold me the wrong patient monitors. What we were to also have are the

monitors that also have two invasive blood pressure modules and an end tidal Co2 module with cables"—knowing full well that TDEM changed its mind and MHF ordered the wrong one. (Dkt. No. 45-1, Exhibit F.)

### E.   MHF Still has in its Possession the Nine Beds and Thirty Six Ventilators And Has Done Nothing to Mitigate Any Claimed Damages.

49.   Although MHF states that it initially rejected the first twenty-seven beds it received, it accepted a second shipment of nine beds.  (Dkt. No. 43, 74:17-22; 75:9-15.)

50.   Because MHF believes "showing potential customers past successful projects is a good way to earn business," it unpacked, and promoted those nine beds on its website.  (*Id.*, 206:19-207:9.)

51.   In fact, as of today, those are still in MHF's possession and still being promoted on its website.  .  (Dkt. No. 43-20, p. 4.)

52.   Although MHF testified that it never put those beds in its facilities, when confronted with their website photographs, MHF stated "I said we never used them" (Dkt. No. 43, 211:14-24.)  MHF admitted they set the beds up as a display, and took photos to promote on their website. (*Id.*, 212:2-19.)

53.   MHF admits that although they are attempting to recover damages for the ventilators, it still has the ventilators in its possession. (*Id.*, 151:18-152:10.)

54.     MHF has done nothing to mitigate any alleged damages. It never attempted to sell the ventilators.  (*Id.*, 151:18-21.)

55.     Nor did MHF ever attempt to donate the ventilators during the height of COVID-19 when hundreds of thousands of people were dying throughout the world due to, in part, a critical shortage of ventilators. (*Id.*, 152:8-10.)

Respectfully submitted this 11th day of November, 2022.

<div style="margin-left: 50%;">

/s/ *Sarah Trevino*
Sarah E. Trevino
Georgia Bar No. 660094
Sarah Hannah Phillips
Georgia Bar No. 302869
**DENTONS US LLP**
303 Peachtree St., NE, Suite 5300
Atlanta, Ga 30308
Telephone: 404-527-4000
sarah.trevino@dentons.com
sarahhannah.phillips@dentons.com
Jason R. Scheiderer
(admitted *pro hac vice*)
**DENTONS US LLP**
4250 Main St., Suite 1100
Kansas City, Missouri 64111
Telephone: 816-460-2400
jason.scheiderer@dentons.com

*Counsel for Defendant*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of

Georgia, that the foregoing **DEFENDANT AVANTE HEALTH SOLUTIONS'S**

**RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN**

**SUPPORT OF SUMMARY JUDGMENT** complies with the font and point

selections approved by this court in L.R. 5.1B.  This pleading was prepared using

14-point Times New Roman Font.

/s/ *Sarah Trevino*
Sarah E. Trevino
Georgia Bar No. 660094

-35-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **DEFENDANT AVANTE HEALTH SOLUTIONS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT** was filed on November 11, 2022 via the Court's ECF electronic filing system and will notify all participating registered users as follows:

Brian S. Goldberg
Leo Kogan
FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339
E-mail: bgoldberg@fmglaw.com
lkogan@fmglaw.com

Alan C. Manheim
25 Alexander Street
Suite 3
Marietta, Georgia 30060
E-mail: alan@acmlaw.net

*/s/ Sarah Trevino*
Sarah Trevino
Georgia Bar No. 660094